IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
_____

AMEIR STEWART, AMIL STEWART, and
JACOB PEÑA,

                            PLAINTIFFS,

                    -versus-

THE CITY OF NEW YORK, a municipal entity, and
NEW YORK CITY POLICE DETECTIVE BRENDAN
O'BRIEN, NEW YORK CITY POLICE DETECTIVE
MATTHEW REICH, NEW YORK CITY POLICE
OFFICER CLYDE MOYER, NEW YORK CITY
POLICE DETECTIVE CESAR BRENES, NEW YORK
CITY POLICE SERGEANT CORNELIUS BUCKLEY,
NEW YORK CITY POLICE SERGEANT MATTHEW
FRIED,NEW YORK CITY POLICE DETECTIVE
STEVEN SPOSITO, NEWYORK CITY POLICE DETECTIVE
MICHAEL RIVERA, NEW YORK CITY POLICE
DETECTIVE STEVEN MARSHALL, NEW YORK
CITY POLICE DETECTIVE VINCENT DICRESCENTO,
NEW YORK CITY POLICE LIEUTENANT (RETIRED)
JAIME ORTIZ, and NEW YORK CITY POLICE
OFFICERS "JOHN DOES" 1-4,

                         DEFENDANTS.

_____

INDEX NO.   14cv2854
                (RJD)(RML)

ECF CASE

FIRST AMENDED
COMPLAINT

JURY TRIAL DEMANDED

Plaintiffs, by their attorneys, STECKLOW COHEN & THOMPSON, complaining of the defendants, respectfully allege as follows:

## I. PRELIMINARY STATEMENT

1.    Plaintiffs brings this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of their civil rights, as said rights are secured by said statutes and the Constitutions of the State of New York and the United States.

2.     On May 29, 2013, the Defendants violently invaded the Plaintiffs' home and falsely arrested each of them. One or more Defendant Police Officers awoke Plaintiff Amil Stewart by forcefully grabbing him by the back of his neck, repeatedly striking and punching Plaintiff Amil Stewart in the jaw, face and body without cause or provocation. Defendant Police Officers were observed proceeding from various other locations around the Plaintiffs' house into Plaintiff Amil Stewart's room to strike him one or more times each, with no apparent law enforcement purpose.

3.     Plaintiffs were transported to the 120th Precinct, where they were charged with violations and crimes that they did not commit. Plaintiffs were held in police custody for approximately thirty-five (35) hours before their release. All charges against Plaintiffs were adjourned in contemplation of dismissal at their arraignments on May 30th, 2013, and dismissed and sealed approximately six (6) months later. Plaintiffs suffered physical injuries, and continue to suffer significant mental and emotional injuries as a result of the Defendants' conduct.

## II. JURISDICTION

4.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(3) and (4) and the aforementioned statutory and constitutional provisions.

5.     Plaintiffs further invoke this Court's supplemental jurisdiction, pursuant to 28 USC. § 1367, over any and all State law claims and causes of action which derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally based claims and causes of action.

6.     Plaintiffs Amil Stewart and Ameir Stewart have complied with all relevant provisions of General Municipal Law §50 in providing notice to Defendant City of New York.

7.     At least thirty days have elapsed since Plaintiffs Amil Stewart and Ameir Stewart filed their Notices of Claim and adjustment or payment thereof have been neglected or refused.  This action is commenced within one year and 90 days from the date of the occurrences alleged herein, as required under Section 50-i of the General Municipal Law.

### III. VENUE

8.    Venue is proper for the United States District Court for the Eastern District of New York, pursuant to 28 U.S.C. § 1391(a), (b), and (c) and § 1402(b) because the acts complained-of herein occurred in this district.

### IV. JURY DEMAND

9.    Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

### V. THE PARTIES

10.    Plaintiff Ameir Stewart is an African-American male and resides in Richmond County, New York.

11.    Plaintiff Amil Stewart is an African-American male and resides in Richmond County, New York.

12.    Plaintiff Jacob Pena is a Hispanic male and resides in Richmond County, New York.

13.    Defendant The City of New York is a municipal corporation organized under the laws of the State of New York.

14.    Defendant the City of New York maintains the New York City Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the New York State Criminal Procedure Law, acting under the direction and supervision of the aforementioned municipal corporation, City of New York.

15.    At all times relevant to this action, Defendant NEW YORK CITY POLICE DETECTIVE BRENDAN O'BRIEN ("Defendant POLICE DETECTIVE O'BRIEN") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

16.   At all times relevant to this action, Defendant NEW YORK CITY POLICE DETECTIVE MATTHEW REICH ("Defendant POLICE DETECTIVE REICH") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

17.   At all times relevant to this action, Defendant NEW YORK CITY POLICE OFFICER CLYDE MOYER ("Defendant POLICE OFFICER MOYER") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

18.   At all times relevant to this action, Defendant NEW YORK CITY POLICE DETECTIVE CESAR BRENES ("Defendant POLICE DETECTIVE BRENES") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

19.   At all times relevant to this action, Defendant NEW YORK CITY POLICE SERGEANT CORNELIUS BUCKLEY ("Defendant POLICE SERGEANT BUCKLEY") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

20.   At all times relevant to this action, Defendant NEW YORK CITY POLICE SERGEANT MATTHEW FRIED ("Defendant POLICE SERGEANT FRIED") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

21.   At all times relevant to this action, Defendant NEW YORK CITY POLICE DETECTIVE STEVEN SPOSITO ("Defendant POLICE DETECTIVE SPOSITO") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

22.   At all times relevant to this action, Defendant NEW YORK CITY POLICE DETECTIVE MICHAEL RIVERA ("Defendant POLICE DETECTIVE RIVERA") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

23.    At all times relevant to this action, Defendant NEW YORK CITY POLICE DETECTIVE STEVEN MARSHALL ("Defendant POLICE DETECTIVE MARSHALL") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

24.    At all times relevant to this action, Defendant NEW YORK CITY POLICE DETECTIVE VINCENT DICRESCENTO ("Defendant POLICE DETECTIVE DICRESCENTO") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

25.    At all times relevant to this action, Defendant NEW YORK CITY POLICE LIEUTENANT (RETIRED) JAIME ORTIZ ("Defendant POLICE LIEUTENANT ORTIZ") was a duly sworn police officer of said department and was acting under the supervision of said department and according to his official duties.

26.    At all times relevant to this action, the Defendant NEW YORK CITY POLICE OFFICERS "John Does" 1-4 were duly sworn police officers of said department and were acting under the supervision of said department and according to their official duties.

27.    Plaintiffs will amend this complaint to name each of the Defendant NEW YORK CITY POLICE OFFICERS "John Does" 1-4 as their identities can be established to a reasonable certainty.

28.    Henceforth, Defendant POLICE DETECTIVE O'BRIEN, Defendant POLICE DETECTIVE REICH, Defendant POLICE OFFICER MOYER, Defendant POLICE DETECTIVE BRENES, Defendant POLICE SERGEANT BUCKLEY, Defendant POLICE SERGEANT FRIED, Defendant POLICE DETECTIVE SPOSITO, Defendant POLICE DETECTIVE RIVERA, Defendant POLICE DETECTIVE MARSHALL, Defendant POLICE DETECTIVE DICRESCENTO, Defendant POLICE LIEUTENANT ORTIZ and each of the Defendant POLICE OFFICERS "John Does" 1-4, may be referred to collectively as "the Defendant Police Officers", and individually as "Defendant Police Officer."

29.    That at all times hereinafter mentioned the Defendant Police Officers were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

30.    Each and all of the acts of the Defendant Police Officers alleged herein were done by said defendants while acting in furtherance and within the scope of their employment by Defendant CITY OF NEW YORK.

## VI. FACTS COMMON TO ALL CLAIMS

31.    On May 29, 2013, at or around 6:00am, the Defendant Police Officers invaded Plaintiffs' home.

32.    According to the CCRB investigation into this incident, Defendant POLICE LIEUTENANT ORTIZ was in command of the Defendant Police Officers who forcibly entered Plaintiffs' home.

33.    Plaintiffs' home is the larger residence in a multiple family dwelling.

34.    Said multiple family dwelling also includes a basement apartment.

35.    On information and belief, said basement apartment has a separate entrance and no through-access to Plaintiffs' home comprising the second residence therein.

36.    According to the CCRB investigation into this incident, Defendant POLICE DETECTIVE O'BRIEN secured a search warrant for the multiple family dwelling containing Plaintiffs' home, which is described erroneously in the search warrant as a single residence.

37.    Plaintiffs were asleep when the Defendant Police Officers broke down the door of Plaintiffs' home and rushed inside.

38.    On information and belief, the Defendant Police Officers did not have a lawful warrant authorizing them to enter Plaintiffs' home.

39.    On information and belief, the Defendant Police Officers had a warrant authorizing them to enter the other unit of the multiple family dwelling containing Plaintiffs' home, but not Plaintiff's home.

THE DEFENDANT POLICE OFFICERS
ATTACK, BRUTALIZE, AND UNLAWFULLY ARREST PLAINTIFF AMIL STEWART

40.    Plaintiff Amil Stewart woke up in a chokehold and headlock and was held above his bed

by the neck by one or more of the Defendant Police Officers.

41.   Plaintiff Amil Stewart could not breathe.

42.   One of the Defendant Police Officers screamed at Plaintiff Amil Stewart, commanding him, in sum and substance, to get on his knees.

43.   Plaintiff Amil Stewart was being held suspended above his bed by one or more of the Defendant Police Officers, and could not breathe, let alone move himself from the bed and down to the floor.

44.   The Defendant Police Officers dropped Plaintiff Amil Stewart down onto his bed, and struck him repeatedly.

45.   On information and belief, some of the Defendant Police Officers struck Plaintiff Amil Stewart with their bare hands, and also with objects.

46.   At some point one of the Defendant Police Officers held Plaintiff Amil Stewart up, so as to make it easier for the other Defendant Police Officers to inflict pain upon Plaintiff Amil Stewart.

47.   Defendant Police Officers who were present in other parts of the Plaintiffs' house went to Plaintiff Amil Stewart's room to strike Plaintiff Amil Stewart one or more times, and would then leave Plaintiff Amil Stewart's room without undertaking any valid law enforcement activity.

48.   The CCRB investigated Defendant POLICE DETECTIVE REICH for using potentially improper physical force against Plaintiff Amil Stewart, and were unable to rule out the possibility that he used improper physical force against Plaintiff Amil Stewart.

49.   The CCRB investigated Defendant POLICE DETECTIVE FRIED for using potentially improper physical force against Plaintiff Amil Stewart, and were unable to rule out the possibility that he used improper physical force against Plaintiff Amil Stewart.

50.   The CCRB investigated Defendant POLICE DETECTIVE BRENES for using potentially improper physical force against Plaintiff Amil Stewart, and were unable to rule out the possibility that he used improper physical force against Plaintiff Amil Stewart.

51.   The CCRB investigated Defendant POLICE DETECTIVE MARSHALL for using potentially improper physical force against Plaintiff Amil Stewart, and were unable to rule out the possibility that he used improper physical force against Plaintiff Amil Stewart.

52.   The CCRB investigated Defendant POLICE SERGEANT BUCKLEY for using potentially improper physical force against Plaintiff Amil Stewart, and were unable to rule out the possibility that he used improper physical force against Plaintiff Amil Stewart.

53.   In a photo identification procedure conducted by the CCRB, Plaintiff Amil Stewart identified Defendant POLICE DETECTIVE RIVERA as an officer who struck Plaintiff Amil Stewart with a police issue tactical shield.

54.   After a time, one or more of the Defendant Police Officers handcuffed Plaintiff Amil Stewart.

55.   The Defendant Police Officers did not have probable cause for Plaintiff Amil Stewart's arrest.

56.   The Defendant Police Officers continued striking and pushing Plaintiff Amil Stewart after he had been handcuffed, until one of the supervising Defendant Police Officers stated, in sum and substance, "That's enough."

57.   In a photo identification procedure conducted by the CCRB, Plaintiff Amil Stewart identified Defendant POLICE DETECTIVE DICRESCENTO as the supervising police officer who half-heartedly intervened in his continued beating by other Defendant Police Officers.

58.   On information and belief, said supervising Defendant Police Officer had been present outside of Plaintiff Amil Stewart's room, watching officers under his command brutally beat Plaintiff Amil Stewart in the absence of any need for said applications of force, without intervening to prevent further injury to Plaintiff Amil Stewart.

59.   Plaintiff Amil Stewart was not resisting the Defendant Police Officers' attack and arrest.

60.   Bloodied and reeling with pain, Plaintiff Amil Stewart was walked downstairs by Defendant Police Officers to the living room of his home, where his father, brother and roommates were handcuffed.

8

61.   One or more of the Defendant Police Officers who beat Plaintiff Amil Stewart called him "an asshole."

## THE DEFENDANT POLICE OFFICERS
## UNLAWFULLY ARREST PLAINTIFF AMEIR STEWART

62.   Plaintiff Ameir Stewart awoke as one of the Defendant Police Officers grabbed him by the back of his neck.

63.   One or more of the Defendant Police Officers threw Plaintiff Ameir Stewart off of his bed and forced his face onto the floor.

64.   One or more of the Defendant Police Officers handcuffed Plaintiff Ameir Stewart behind his back.

65.   The Defendant Police Officers applied the handcuffs too tightly, causing Plaintiff Ameir Stewart significant pain in his hands and wrists.

66.   Plaintiff Ameir Stewart observed several of the Defendant Police Officers lining up in order to beat his brother, Plaintiff Amil Stewart.

67.   At no point did Plaintiff Ameir Stewart resist the Defendant Police Officers' unlawful arrest.

68.   The Defendant Police Officers did not have probable cause for Plaintiff Ameir Stewart's arrest.

## THE DEFENDANT POLICE OFFICERS

## UNLAWFULLY ARREST PLAINTIFF JACOB PENA

69.   Plaintiff Jacob Pena awoke in his bedroom upstairs when he heard the Defendant Police Officers enter Plaintiffs' home.

70.   Several of the Defendant Police Officers rushed into Plaintiff Jacob Pena's room.

71.   Plaintiff Jacob Pena had already begun stepping down the ladder from his loft bed when the Defendant Police Officers entered his room.

72.   Plaintiff Jacob Pena's hands and arms were raised above his head.

73.   One or more of the Defendant Police Officers unlawfully handcuffed and arrested Plaintiff Jacob Pena.

74.   At no point did Plaintiff Jacob Pena resist the Defendant Police Officers' unlawful arrest.

75.   The Defendant Police Officers did not have probable cause to arrest Plaintiff Jacob Pena.

76.   The Defendant Police Officers ordered Plaintiff Jacob Pena out of his bedroom and into the upstairs hallway of the Plaintiffs' home.

77.   While standing in the hallway, Plaintiff Jacob Pena observed several of the Defendant Police Officers moving into and out of Plaintiff Amil Stewart's room, apparently for the sole purpose of participating in the mass beating of Plaintiff Amil Stewart.

78.   Plaintiff Jacob Pena asked one of the Defendant Police Officers whether the officer would do anything to stop the other officers from needlessly and relentlessly beating Plaintiff Amil Stewart.

79.   In response, one or more of the Defendant Police Officers ordered Plaintiff Jacob Pena to look away from Plaintiff Amil Stewart's room and, in sum and substance, "Face the wall."

80.   Plaintiff Jacob Pena complied, and stood outside of his room for several more minutes, staring at the wall and listening to Defendant Police Officers beat his friend and housemate, before being escorted downstairs by one or more Defendant Police Officers.

<u>THE DEFENDANT POLICE OFFICERS HOLD PLAINTIFFS IN THEIR CUSTODY UNTIL APPROXIMATELY 5:00PM, MAY 30th, 2013</u>

81.   After falsely arresting Plaintiffs, the Defendant Police Officers held Plaintiffs in a police vehicle and drove them around for approximately two (2) hours, before arriving at the 120th Precinct.

82.   While Plaintiffs were handcuffed in the police vehicle, the Defendant Police Officers stopped for coffee.

83.   While at the 120th Precinct, Plaintiff Amil Stewart, on multiple occasions, requested

medical treatment.

84. The Defendants ignored and mocked Plaintiff Amil Stewart's requests.

85. The Defendants mocked Plaintiff Amil Stewart's requests, threatening him with extended detention if he received medical treatment.

86. In a photo identification procedure conducted by the CCRB, Plaintiff Amil Stewart identified Defendant POLICE DETECTIVE MARSHALL as one of the officers who denied him medical attention.

87. Plaintiff Amil Stewart persisted, and was eventually transferred to Richmond University Hospital.

88. After receiving medical treatment, Plaintiff Amil Stewart was brought back to the 120th Precinct.

89. The following morning, May 30, 2013, Plaintiffs were transferred to Staten Island Central Booking.

90. Plaintiffs were arraigned at or around 5:00pm on May 30th, 2013, approximately thirty-five (35) hours after their unlawful arrest.

91. Plaintiffs were falsely charged under P.L. § 205.30, Resisting Arrest, and P.L. § 221.05, Unlawful Possession of Marijuana.

92. Plaintiffs committed neither offense.

93. The baseless charges preferred against the Plaintiffs were adjourned in contemplation of dismissal ("ACD") at arraignment.

94. Since participating in a CCRB investigation of the incident underlying this action, Plaintiff Jacob Pena has been stopped and harassed by two of the Defendant Police Officers, whose particular identities are unknown to Plaintiff Jacob Pena.

95. The Defendant Police Officers who stopped and harassed Plaintiff Jacob Pena made threatening and untoward comments toward Plaintiff Jacob Pena, indicating that they would be

watching him and looking for reasons to arrest him in the future, despite not having any information indicating that Plaintiff Jacob Pena was engaged in any sort of criminal activity.

96.   As a result of the foregoing, Plaintiffs sustained, *inter alia,* mental injuries, emotional distress, embarrassment, humiliation and deprivation of their constitutional rights.

---

### FIRST CLAIM FOR RELIEF
### <u>DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983</u>

97.   Plaintiffs incorporate the allegations above by reference.

98.   All of the aforementioned acts deprived Plaintiffs of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

99.   The Defendant Police Officers and Defendant the CITY OF NEW YORK, collectively and individually, while acting under color of state law, engaged in Constitutionally-violative conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

100.  As a result of the foregoing, Plaintiffs' liberties was restricted for an extended period of time, Plaintiffs were put in fear for their safety and were humiliated, without probable cause.

101.  As a result of the above constitutionally impermissible conduct, Plaintiffs were caused to suffer personal injuries, violation of civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages, legal expenses and damage to their reputations and standings within their communities

102.  As a result of Defendants' impermissible conduct, Plaintiffs demands judgment against Defendants in a sum of money to be determined at trial.

### SECOND CLAIM FOR RELIEF
### <u>FALSE ARREST UNDER 42 U.S.C. § 1983</u>

103.  Plaintiffs incorporate the allegations above by reference.

104.  Plaintiffs were taken into custody and caused to be falsely imprisoned, detained, and

confined without any probable cause, privilege or consent.

105.  As a result of the foregoing, Plaintiffs' liberties were restricted for extended periods of time.

106.  As a result of the foregoing, Plaintiffs were put in fear for their own safety and humiliated without probable cause.

107.  As a result of Defendants' impermissible conduct, Plaintiffs demand judgment against defendants in a sum of money to be determined at trial.

**THIRD CLAIM FOR RELIEF**
**EXCESSIVE FORCE UNDER 42 U.S.C. § 1983**

108.  Plaintiffs incorporate the allegations above by reference.

109.  Defendants administered a brutal beating upon Plaintiff Amil Stewart in the absence of need for such action and force.

110.  Defendants handcuffed Plaintiff Amil Stewart without probable cause for Plaintiff Amil Stewart's arrest.

111.  Defendants roughly seized and handcuffed Plaintiff Ameir Stewart without probable cause for Plaintiff Amir Stewart's arrest.

112.  Defendants handcuffed Plaintiff Jacob Pena without probable cause for Plaintiff Jacob Pena's arrest.

113.  The level of force employed by Defendants against Plaintiffs was objectively unreasonable.

114.  The force employed by Defendants against Plaintiffs did not advance any proper governmental objective.

115.  As a result of the aforementioned conduct, Plaintiffs suffered and sustained physical injuries.

116.  As a result of Defendants' impermissible conduct, Plaintiffs demand judgment against defendants in a sum of money to be determined at trial.

## FOURTH CLAIM FOR RELIEF
## FAILURE TO INTERVENE UNDER 42 U.S.C. § 1983

117.  Plaintiffs incorporate the allegations above by reference.

118.  Each of the Defendant Police Officers had an affirmative duty to intervene on Plaintiffs' behalf, to prevent the violation of Plaintiffs' constitutional rights.

119.  Each of the Defendant Police Officers failed to intervene on Plaintiffs' behalf in order to prevent the violation of their constitutional rights despite having had realistic opportunities to do so.

120.  Each of the Defendant Police Officers failed to intervene on Plaintiffs' behalf, to prevent the violation of Plaintiffs' constitutional rights despite having substantially contributed to the circumstances within which Plaintiffs' rights were violated by the Defendants' affirmative conduct.

121.  As a result of the aforementioned conduct of the individual Defendants, Plaintiffs constitutional rights were violated.

122.  Plaintiffs demand compensatory and punitive damages in a sum of money to be determined at trial, together with attorneys' fees and costs.

## FIFTH CLAIM FOR RELIEF
## EQUAL PROTECTION UNDER 42 U.S.C. § 1983

123.  Plaintiffs incorporate the allegations above by reference.

124.  That at all times described herein, Plaintiffs were possessed of the right to equal protection under the laws, as guaranteed under the 14th Amendment to the United States Constitution.

125.   The defendants subjected Plaintiffs to assault, battery, use of excessive force, unlawful arrest, and other violations of Plaintiffs' Constitutional rights in the manner described herein because they knew that they could do so with impunity.

126.  The defendants' particular acts of subjecting Plaintiff to assault, battery, use of excessive force, unlawful arrests, and other violations of Plaintiff's constitutional rights in the manner

described herein, were the result of a perceived ease of charging and prosecuting minority, working-class individuals with crimes and/or violations in order to cover up for constitutionally-violative conduct.

127.  The defendants undertook the particular actions described herein against Plaintiffs because Plaintiffs are African-American and Hispanic individuals, that the Defendant Police Officers would not have undertaken against others similarly situated, in whole or in part due to the Plaintiffs' ethnicities.

128.  As a result of the aforementioned conduct, the Defendants violated Plaintiffs' constitutional rights to equal protection under the law.

129.  As a result, Plaintiffs were harmed.

130.  As a result of Defendants' impermissible conduct, Plaintiffs demand judgment against defendants in a sum of money to be determined at trial.

### SIXTH CLAIM FOR RELIEF
### ON BEHALF OF PLAINTIFF AMIL STEWART
### DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS

131.  Plaintiffs incorporate the allegations above by reference.

132.  The Defendant City Defendant City of New York and the Defendant Police Officers have acted under color of law to deprive Plaintiff Amil Stewart of his civil, constitutional and statutory rights to due process of law pursuant to the Fourth and Fourteenth Amendments of the United States Constitution and are liable to Plaintiff Amil Stewart under 42 USC §1983 and the New York State Constitution.

133.  The Defendant City of New York and the Defendant Police Officers knew or should have known that the Plaintiff Amil Stewart faced a substantial risk of permanent disability, and disregarded that risk by constructively denying needed medical treatment to Plaintiff Amil Stewart by threatening Plaintiff Amil Stewart with extended pre-arraignment incarceration as a condition of receiving needed medical treatment.

134.  The Defendant City of New York and the Defendant Police Officers' deliberate indifference caused Plaintiff Amil Stewart to sustain serious and permanent injury.

135. The Defendant Police Officers' constructively denied needed medical treatment to Plaintiff Amil Stewart by threatening Plaintiff Amil Stewart with extended pre-arraignment incarceration as a condition of receiving needed medical treatment constituted deliberate disregard towards Plaintiff Amil Stewart's serious medical needs and the substantial risk of serious harm he faced.

136. Plaintiff Amil Stewart was damaged by the deliberate indifference of the Defendant City of New York and the Defendant Police Officers.

137. As a result of Defendants' impermissible conduct, Plaintiff Amil Stewart demand judgment against defendants in a sum of money to be determined at trial.

### SEVENTH CLAIM FOR RELIEF – MUNICIPAL LIABILITY UNDER *MONELL*

138. Plaintiffs incorporate the allegations above by reference.

139. Defendants arrested and incarcerated Plaintiffs in the absence of any evidence of criminal wrongdoing, notwithstanding their knowledge that said arrest and incarceration would jeopardize Plaintiffs' liberty, well-being, safety and constitutional rights.

140. The arrests of the Plaintiff were unlawful and lacked probable cause.

141. On information and belief, Plaintiffs were arrested to justify their wrongful seizure and detainment by the Defendant Police Officers, and particularly to justify Plaintiff Amil Stewart's brutal beating by some or all of the Defendant Police Officers.

142. On information and belief, the wrongful arrests of Plaintiffs were not undertaken by the Defendant Police Officers in furtherance of their duties, or otherwise privileged.

143. On information and belief, the arrests and detentions of Plaintiffs were undertaken to clothe the wrongful actions of the Defendant Police Officers under color of law.

144. On information and belief, the wrongful arrests of the Plaintiffs were undertaken as part of a "collars for dollars" effort to make numerous, time-consuming arrests in order to cause the individual Defendant Police Officers to become eligible for overtime pay.

145. The acts complained of were carried out by the aforementioned individual Defendant Police Officers in their capacities as police officers and officials, with all the actual and/or

apparent authority attendant thereto.

146. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

147. The aforementioned customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department include, but are not limited to, the following unconstitutional practices:

    a. wrongfully arresting individuals without probable cause in attempts to justify excessive uses of force (i.e. "cover charge" arrests);

    b. condoning needless and excessive applications of force against civilians by New York City Police Officers;

    c. wrongfully arresting individuals for drug offenses on the basis of false testimony and averments by New York City Police Officers (i.e. "testilying");

    d. wrongfully arresting individuals in order to become eligible for overtime pay arising out of arrest processing time (i.e. "collars for dollars");

    e. wrongfully arresting individuals on the basis of narcotic and/or other contraband evidence planted by New York City Police Officers on the persons or property of arrestees, or otherwise pursuant to false claims to have recovered narcotics and/or other contraband evidence from the persons or property of arrestees (i.e. "flaking"); and

    f. failing to curb New York City Police Officers' continuing custom or practice of lying, obfuscating or otherwise providing false or misleading information to internal and external investigators of police misconduct, and punishing officers who fail to do so (i.e., the "Blue Wall of Silence").

148. On July 7, 1994, a blue ribbon panel led by Hon. J. Milton Mollen ("The Mollen Commission") presented the report of its nearly two-year investigation into allegations of NYPD corruption, undertaken in 1992 at the behest of then-Mayor David Dinkins ("The Mollen

Commission Report," "The Report").[1]

149.  The July 7, 1994 Mollen Commission Report was prepared for and at the request of the Defendant CITY OF NEW YORK, and therefore knowledge of its contents may be imputed to Defendant CITY OF NEW YORK.

150.  The Mollen Commission Report found that police officers commonly covered up their fellow officers' misconduct, including but not limited to excessive applications of force against civilians, in accordance with a custom or practice known as a "code of silence" or "Blue Wall of Silence.

151.  The above-referred custom or practice of members of the New York City Police Department known as the "Blue Wall of Silence" was discussed at length on pages 53-59 of the July 7, 1994 Mollen Commission Report.

152.  The *Mollen Commission Report* explicitly identified police brutality, including "implicit or explicit threat[s] of physical harm[,]" and official tolerance thereof, as critical issues that must be investigated by "any Commission investigating police corruption." Id. at 44.

153.  The *Mollen Commission* went on to fault the NYPD's intelligence gathering regarding incidents of brutality as "wholly inadequate." Id. at 45.

154.  The *Mollen Commission* found that "[police b]rutality is… used as a rite of initiation to prove that an officer is a tough or 'good' cop, one who can be accepted and trusted by his fellow officers not to report wrongdoing." Id. at 47.

155.  One officer who testified before the Mollen Commission noted that brutality "is a form of acceptance.  It's not simply giving a beating.  It's the other officers begin [sic] to accept you more." Id.

156.  The Mollen Commission also found that NYPD "supervisors sometimes turn a blind eye to evidence of unnecessary violence…. [b]ecause a complaint usually comes down to an officer's

---

[1] Mollen, Baer, Evans, Lankler, Tyler, Armao, Cornfeld, "The City of New York Commission to Investigate Allegations of Police Corruption and The Anti-Corruption Procedures of The Police Department Commission Report," July 7, 1994, City of New York.  Incorporated by reference herein and available online at http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

word (and often the word of fellow officer witnesses) against the… [complainant's] word, it is easy for a supervisor to let clear acts of brutality slide by without recourse." The Report at 49.

157.  On information and belief, Defendant CITY OF NEW YORK did not take meaningful steps to eliminate the custom or practice of officers employing excessive force against civilians.

158.  On information and belief, Defendant CITY OF NEW YORK did not take meaningful steps to eliminate the enabling custom or practice of officers actively or passively covering up other officers' misconduct, including but not limited to employing excessive force against civilians.

159.  That the Defendant CITY OF NEW YORK continued to have notice after 1994 that the officers and commanders of the New York City Police Department continued to tolerate and encourage police to lie to cover up the wrongful conduct of themselves and their fellow officers after the publication of the Mollen Commission Report can be shown with reference to the following cases:

      a.  **Ariza v. City of New York**, 1996 U.S. Dist. LEXIS 20250, 14 (E.D.N.Y. March 7, 1996) ["The [municipal] defendants concede, however, that the code exists to prevent other officers from reporting corruption or dishonesty by fellow officers…. [t]he principle behind the 'blue wall of silence' is that officers will suffer recrimination for breaking ranks and subjecting police conduct to public scrutiny."]

      b.  **White-Ruiz v. City of New York**, 1996 U.S. Dist. LEXIS 15571, 23 (S.D.N.Y. October 21, 1996)  ["[P]laintiff offers sufficient evidence to permit a reasonable trier of fact to infer that the 'blue wall of silence' constitutes a custom or usage of the Department"]

      c.  **United States v. Rosario**, 237 F. Supp. 2d 242, 248 (E.D.N.Y. 2002) ["[Assistant U.S. Attorney] Palmer testified that while supervising the federal investigation into the Louima assault, she routinely confronted a 'blue wall of silence' erected by police officers and PBA officials intent on obstructing efforts to uncover the full truth about what had happened at the 70th precinct on August 9, 1997."]

      d.  **Barry v. New York City Police Dep't**, 2004 U.S. Dist. LEXIS 5951, 40-41 (S.D.N.Y. April 7, 2004) ["[P]laintiff's witnesses speak from firsthand experience about the blue wall of silence…. Plaintiff complains of acts that are of the precise nature as the customs and practices described in the [Mollen Commission] Report."

      e.  **Griffin v. City of New York et al.**, 10-CV-01824 (E.D.N.Y. 2010) [Plaintiff detective sues on pattern of retaliation following his reporting fellow detective to

Internal Affairs, fellow officers cover for detective accused of misconduct, see, e.g., at ¶35: "Internal Affairs conducted its investigation into [Detective] Plaintiff's allegations [of misconduct] against [Detective] McCarthy. All of the material witnesses failed to cooperate with the investigation by being less than truthful…. [a]s a result, the allegations made by Plaintiff against McCarthy were dismissed as unsubstantiated."]

160.  On information and belief, Defendant CITY OF NEW YORK tacitly condones its police officers' continuing and widespread practice of undertaking extraordinary and unjustified uses of force against persons and persons' property.

161.  On information and belief, Defendant CITY OF NEW YORK has not taken any meaningful steps to eliminate the enabling custom or practice of officers actively or passively covering up other officers' misconduct, including but not limited to employing excessive force against civilians.

162.  In 2012, the City of New York paid out $151.9 million in legal settlements involving police misconduct and civil rights lawsuits against the NYPD. *City of New York Office of the Comptroller Claims Report Fiscal Year 2012* at 44.

163.  On information and belief, and despite due and repeated notice that New York City Police Officers have an ongoing decades-old custom or practice of charging individuals with crimes and violations as pretexts to justify use of force, to date, Defendant CITY OF NEW YORK has not implemented any particular training, oversight measures or policies designed or intended to curtail the improper use by New York City Police Officers of so-called "cover charges."

164.  On April 8, 2014, NYPD Chief of Internal Affairs Joseph Reznick authored a memo criticizing police officers for numerous "collars for dollars" arrests, meaning arrests undertaken in order to generate extra overtime pay for NYPD officers, stating that "some overtime was borderline abuse," among other remarks.[2]

---

[2] Rocco Parascandola, "EXCLUSIVE: NYPD Internal Affairs chief sends scathing memo warning cops against making arrests just to earn overtime," New York Daily News, April 15, 2014, available online at http://www.nydailynews.com/new-york/nyc-crime/nypd-internal-affairs-warns-cops-making-arrests-earn-overtime-article-1.1757248

165.  On information and belief, "collars for dollars" arrests are widespread among the NYPD, and the culture of the NYPD condones depriving individuals of their liberty in order to enhance officers' pay.

166.  On information and belief, the arrests of the Plaintiffs herein were motivated in whole or in part by a motivation to earn extra overtime pay, as evidenced by the arrests of the Plaintiffs generally pursuant to a warrant to search an adjacent residence, as well as by the significant delays in the detentions and processings of the Plaintiffs.

167.  Among the species of police corruption explored in The Report, particular note was made of the practice of "testilying," or false testimony and falsification of records in connection with arrests.  The Report at 36.

168.  The Mollen Commission found "testilying" to be "probably the most common form of police corruption facing the criminal justice system, particularly in connection with arrests for possession of narcotics and guns."  Id.

169.  The Mollen Commission explained that officers are particularly prone to engage in "testilying" with respect to said charges because "[t]he vast majority of charges for narcotics or weapons possession crimes result in pleas without the necessity of grand jury or trial testimony, thus obviating officers' concerns about the risk of detection and possible exposure to criminal charges of perjury."  The Report at 37.

170.  The Mollen Commission made particular note of "testilying" in an undisclosed unit of the NYPD's narcotics division, "where… [The Mollen Commission's] analysis of police records and intelligence sources indicated that the incidence of falsifications might run high."  The Report at 38-39.

171.  The Report continues: "While we cannot disclose the details of our investigation because we have referred the evidence to a prosecutor, the evidence suggests that certain officers in this unit falsified documents and may have committed testimonial perjury to conceal constitutional violations.  Even more troubling, **the evidence suggests that the unit's commanding officer not only tolerated, but encouraged, this unlawful practice**."  The Report at 39 (emphasis

added).

172.  The practice of officers "testilying" with respect to narcotics charges continues in the NYPD to date.

173.  In 2008, now-former NYPD undercover officer Steve Anderson was caught on video purchasing three bags of cocaine from an employee of a nightclub in Queens.[3]

174.  Anderson did not arrest the person who sold the drugs to him.  Id.

175.  Instead, Anderson provided the drugs to then-fellow NYPD undercover officer Henry Tavarez. Id.

176.  Tavarez then used the drugs to support the false arrests of four people. Id.

177.  As a result of this and like incidents, prosecutors in Brooklyn and Queens have dismissed charges against approximately four hundred (400) individuals whose arrests were believed to have been tainted by the corrupt acts of NYPD officers.  Id.

178.  Another detective from the same unit, Jason Arbeeny, was recently convicted of various crimes in relation to his own 2007 conduct of planting a bag of crack cocaine in the car of a Coney Island couple to support narcotics charges against said couple.[4]

179.  In that case, on November 1, 2011, "[b]efore announcing the verdict, Justice Reichbach scolded the department for what he described as a widespread culture of corruption endemic in its drug units.  'I thought I was not naïve,' he said. 'But even this court was shocked, not only by the seeming pervasive scope of misconduct but even more distressingly by the seeming casualness by which such conduct is employed.'"  Id.

180.  Justice Reichbach continued: "Anything goes in the never-ending war on drugs… and a refusal to go along with questionable practices raise the specter of blacklisting and isolation."  Id.

---

[3] Jim Dwyer, "The Drugs? They Came From The Police," New York Times, October 13, 2011, incorporated by reference herein and available online at http://www.nytimes.com/2011/10/14/nyregion/those-drugs-they-came-from-the-police.html?ref=nyregion
[4] Tim Stellow, "Detective is Found Guilty of Planting Drugs," New York Times, November 1, 2011, incorporated by reference herein and available online at http://www.nytimes.com/2011/11/02/nyregion/brooklyn-detective-convicted-of-planting-drugs-on-innocent-people.html?_r=2&partner=rss&emc=rss

181.   The practice of false drug arrests is colloquially referred to as "flaking."[5]

182.   The particular arrests of Plaintiffs are believed to have been effected in whole or in part by the aforesaid practices of "testilying" and "flaking" because Plaintiffs' arrests for alleged marijuana possession and resisting arrest were undertaken in the absence of probable cause to arrest, when Plaintiffs were not in possession of marijuana and had not resisted arrest.

183.   On information and belief, the above-referred constitutionally violative policies, practices and customs remain widespread, open, and notorious throughout the NYPD to date.

184.   On information and belief, the policymakers of the NYPD and Defendant CITY OF NEW YORK are aware that these practices and customs of NYPD officers continue to date, and have failed to take adequate steps to curb these practices and customs, which regularly cause the violation of citizens Constitutional rights.

185.   Defendant CITY OF NEW YORK has failed to meaningfully curb these Constitutionally-violative customs and practices to date.

186.   The policy of failure to screen, discipline, supervise, counsel, transfer, control, and correct unconstitutional patterns or conditions, is evidenced, inter alia, by the cases and reports cited above.

187.   On information and belief, Defendant CITY OF NEW YORK, and the NYPD failed to effectively screen, train, supervise and discipline its police officers, including, but not limited to, the Defendant Police Officers herein, as demonstrated by their propensity for group violence, including excessive use of force and restraint, and deliberate indifference to serious medical needs, and for their failure to protect citizens from unconstitutional conduct of other police officers.

188.   On information and belief, Defendant CITY OF NEW YORK, failed to put into place and otherwise maintained an inadequate structure for risk containment and stress management relative to its police officers.  Inter alia, the structure was deficient at the time of pre-selection

---

[5] Parascandola, Kappstatter, Doyle and Schapiro, "Cop Morale Low After String of NYPD Scandals Puts Department Under Fire," New York Daily News, October 23, 2011, incorporated by reference herein and available online at http://articles.nydailynews.com/2011-10-23/local/30329895_1_bronx-cop-internal-affairs-bureau-captains-endowment-association

and selection to evaluation and exchange within the command structure about the performance of individual police officers; to the training of supervisory personnel to effectively and adequately evaluate performance of an officer; and to otherwise put the command structure on notice that an individual was at significant levels of risk to the public at large or to specific segments thereof.

189.  The net effect of these deficiencies and failures was to permit police officers of the NYPD to function at levels of significant and substantial risk to the public.

190.  On information and belief, Defendant CITY OF NEW YORK continues to resist collection and disclosure of data concerning the prevalence of police brutality, choosing to conceal the problem from the public in order to continue its policy of acquiescence in such practices without fear of public or political backlash.

191.  On information and belief, Defendant CITY OF NEW YORK continues to condone or otherwise permit shortcomings and deficiencies in the New York City Police Departments' recruitment, training, and management practices that allow the practice and custom of the use of excessive force and police brutality by the police officers of the NYPD to continue.

192.  On information and belief, Defendant CITY OF NEW YORK continues to condone or otherwise permit flawed and/or deficient systems of reporting, oversight, and accountability that allow the practice and custom of the use of excessive force and police brutality by the police officers of the NYPD to continue.

**EIGHTH CLAIM FOR RELIEF**
**RETALIATION FOR FIRST AMENDMENT**
**PROTECTED EXPRESSION UNDER 42 U.S.C. § 1983**

193.  Plaintiffs incorporate the allegations above by reference.

194.  Plaintiff Jacob Pena engaged in protected speech and conduct, including but not limited to: participating in a CCRB investigation of the Defendants' conduct in this incident.

195.  As a direct result of Plaintiff Jacob Pena's protected speech activity, he was subjected to a pretextual stop, threats, and verbal harassment by some of the Defendant Police Officers.

196.  Defendants took adverse action against Plaintiff Jacob Pena in order to punish him for engaging in protected speech and conduct.

197.  Defendants took adverse action against Plaintiff Jacob Pena by unlawfully detaining him against his will.

198.  Defendants took adverse action against Plaintiff Jacob Pena by threatening him with continuing close surveillance for crimes and violations, in the absence of any reasonable cause for same.

199.  Upon information and belief, there was a causal connection between the protected speech and conduct engaged in by Plaintiff Jacob Pena and the adverse actions taken by Defendants.

200.  The causal connection between the protected speech and conduct engaged in by Plaintiff Jacob Pena and the adverse actions taken against him by Defendants was demonstrated by, among other things, the fact that Defendant Police Officers only sought out, detained and threatened Plaintiff Jacob Pena in the absence of justification once he had participated in the CCRB investigation of Defendants' acts in the course of this incident.

201.  As a result of the above constitutionally impermissible conduct, Plaintiff Jacob Pena was caused to suffer violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation and loss of freedom.

202.  As a result of Defendants' impermissible conduct, Plaintiff Jacob Pena demands judgment against Defendants in a sum of money to be determined at trial.

## STATE LAW CLAIMS
## NINTH CLAIM FOR RELIEF - ASSAULT

203.  Plaintiffs incorporate the allegations above by reference.

204.  Defendants intentionally threatened imminent, offensive, and harmful contact with Plaintiffs.

205.  The Defendants' intentional threat of imminent, offensive, and harmful contact with Plaintiffs put Plaintiffs in apprehension of a battery from the Defendants.

206.  The Defendants' intentional threat of imminent, offensive, and harmful contact with Plaintiffs would put a reasonable person aware of the circumstances in apprehension of a battery from the Defendant Police Officers.

207.  As a result of the Defendants' conduct, Plaintiffs were caused to suffer physical as well as mental and emotional injuries, negligent and intentional infliction of emotional distress, anguish, anxiety, fear, and humiliation.

208.  As a result of Defendants' impermissible conduct, Plaintiffs demand judgment against defendants in a sum of money to be determined at trial.

<u>**TENTH CLAIM FOR RELIEF - BATTERY**</u>

209.  Plaintiffs incorporate the allegations above by reference.

210.  The Defendant Police Officers who seized and apprehended Plaintiffs committed battery upon Plaintiffs in the course of Plaintiffs' apprehension by tightly handcuffing Plaintiffs without justification for said contact.

211.  The Defendant Police Officers committed battery upon Plaintiff Amil Stewart when they punched and struck him multiple times, without Plaintiff Amil Stewart's consent, and without any privilege or justification to do so.

212.  The circumstances presented to the Defendant Police Officers at the time did not support the above-referred applications of force upon Plaintiffs.

213.  Plaintiffs were injured by the Defendant Police Officers' non-consensual and unprivileged physical contact.

214.  As a result of the foregoing, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

215.  Plaintiffs demand compensatory and punitive damages in a sum of money to be determined at trial, together with attorneys' fees and costs.

<u>**ELEVENTH CLAIM FOR RELIEF**
**NEGLIGENCE**</u>

216.  Plaintiffs incorporate the allegations above by reference.

217.  The Defendants, as a result of having Plaintiffs in their custody, owed a duty of care to

Plaintiffs, to prevent Plaintiffs from being subjected to assault and battery, and to prevent violations of Plaintiffs' constitutional rights in the manner described herein.

218.  The Defendants breached this duty, and were negligent in allowing Plaintiffs to be assaulted and battered in the matter described herein.

219.  The Defendants' breach of their duty of care owed to Plaintiffs was the direct and proximate cause of Plaintiffs' injuries.

220.  Plaintiffs received both actual and substantial physical and mental injures as a result of the Defendant' breach of their duty owed to Plaintiffs.

221.  As a result of the foregoing, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

### TWELFTH CLAIM FOR RELIEF
### RESPONDEAT SUPERIOR AGAINST
### DEFENDANT CITY OF NEW YORK

222.  Plaintiffs incorporate the allegations above by reference.

223.  The Defendant Police Officers were at all times acting within the scope of their employment as employees of Defendant THE CITY OF NEW YORK.

224.  The actions of the Defendant Police Officers were generally foreseeable and a natural incident of their employment by Defendant THE CITY OF NEW YORK.

225.  As a result of the actions of the Defendant Police Officers, the Plaintiffs were harmed.

226.  Defendant THE CITY OF NEW YORK is liable for the actions of the Defendant Police Officers.

227.  As a result of the foregoing, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.

### THIRTEENTH CLAIM FOR RELIEF
### NEGLIGENT HIRING AND RETENTION AGAINST
### DEFENDANT THE CITY OF NEW YORK

228.  Plaintiffs incorporate the allegations above by reference.

229.  Defendant THE CITY OF NEW YORK failed to use reasonable care in the hiring and retention of the Defendant Police Officers.

230.  Defendant THE CITY OF NEW YORK failed to use reasonable care in the training and supervision of the Defendant Police Officers, permitting and enabling them to engage in the wrongful conduct heretofore alleged in this Complaint.

231.  As a result, Plaintiffs were harmed.

232.  As a result of the foregoing, Plaintiffs demand judgment against Defendants in a sum of money to be determined at trial.


### FOURTEENTH CLAIM FOR RELIEF
### NEGLIGENT TRAINING AND SUPERVISION AGAINST
### DEFENDANT CITY OF NEW YORK

233.  Plaintiffs incorporate the allegations above by reference.

234.  Upon information and belief, Defendant City of New York failed to use reasonable care in the training and supervision of the aforesaid Defendant Police Officers who participated in the assault, battery, use of excessive force, unlawful arrests, and other violations of Plaintiffs' constitutional rights in the manner described herein.

235.  Upon information and belief, Defendant City of New York failed to use reasonable care in the training and supervision of the aforesaid Defendant Police Officers who participated in the assault, battery, use of excessive force, unlawful arrests, and other violations of Plaintiffs' constitutional rights in the manner described herein.

236.  Defendant City of New York knew, or should have known that the requirements, guidelines, and terms of its training for the Defendant Police Officers were inadequate to prevent

the Defendant Police Officers from engaging in the wrongful conduct against Plaintiffs

heretofore alleged in this complaint.

237.  As a result of the above constitutionally impermissible conduct, Plaintiffs were harmed.

238.  As a result of Defendants' impermissible conduct, Plaintiffs demand judgment against

Defendants in a sum of money to be determined at trial.

**FIFTEENTH CLAIM FOR RELIEF**
**PUNITIVE DAMAGES AGAINST ALL DEFENDANTS**

239.  The actions of the individual defendants constituted intentional violations of federal and

state law.

240.  The actions of the individual defendants were motivated by evil motive or intent, or

involved reckless or callous indifference to the federally protected rights of the Plaintiffs.

241. As a result of the foregoing, Plaintiffs demand punitive damages against Defendants in a

sum of money to be determined at trial.

WHEREFORE and in light of the foregoing, it is respectfully requested that the Court assume jurisdiction and:

[a] Invoke pendent party and pendent claim jurisdiction.

[b] Award appropriate compensatory and punitive damages.

[c] Award appropriate declaratory and injunctive relief.

[d] Empanel a jury.

[e] Award attorney's fees and costs.

[f] Award such other and further relief as the Court deems to be in the

interest of justice.


DATED:        New York, New York
              March 3, 2015



                          Respectfully submitted,


                          _____~//s//~_____
                          SAMUEL B. COHEN [SC 7406]
                          STECKLOW COHEN & THOMPSON
                          10 SPRING STREET – SUITE 1
                          New York, New York 10012
                          [212] 566-8000
                          [212] 202-4952/FAX
                          ATTORNEYS FOR PLAINTIFFS